NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180503-U

NO. 4-18-0503

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Adams County |
| GREGORY L. FRIDAY, | ) | No. 17CF363 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Michael L. Atterberry, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices DeArmond and Harris concurred in the judgment.

**ORDER**

¶ 1   *Held*:   No plain error occurred with the prosecutor's closing arguments, the circuit
court's directive to the jury, and the court's determination defendant was fit to
stand trial.

¶ 2       In May 2017, the State charged defendant, Gregory L. Friday, by information
with one count of methamphetamine possession (720 ILCS 646/60(b)(1) (West 2016)) and one
count of resisting a peace officer (720 ILCS 5/31-1(a) (West 2016)).  After a May 2018 trial, a
jury found defendant guilty of both charges.  Defendant filed a motion for judgment
notwithstanding the jury verdict and a motion for a new trial.  At a joint July 2018 hearing, the
Adams County circuit court denied defendant's posttrial motions and sentenced him to
concurrent terms of three years' imprisonment for methamphetamine possession and 180 days in
the county jail for resisting a peace officer.

¶ 3       Defendant appeals, contending (1) he was denied his right to a fair trial because of

numerous improper remarks by the prosecutor in closing arguments, (2) the circuit court denied him a fair trial by directing the jurors to not ask questions during deliberations, (3) the cumulative effect of the two aforementioned errors constitutes plain error, and (4) the circuit court erred by failing to *sua sponte* order a fitness hearing after it was presented with facts raising a *bona fide* doubt as to defendant's fitness to stand trial.  We affirm.

¶ 4                                    I. BACKGROUND

¶ 5            The charges in this case arose after the police executed on May 2, 2017, an arrest warrant for defendant and search warrant for defendant's residence at 614 College Avenue in Quincy, Illinois.

¶ 6            At an October 26, 2017, pretrial hearing, defense counsel raised the issue of defendant's fitness and asked to have defendant evaluated by Dr. Frank Froman to "get rid of any possible concerns as to that issue."  The State did not object to defense counsel's oral motion for a fitness examination.  Defendant stated he was fit and had paperwork.  The circuit court continued defendant's trial.  At the December 6, 2017, pretrial hearing, defendant brought documents with him to court.  Defense counsel stated he would like a little bit more information and asked for a continuance.  Defendant had yet to be evaluated by Dr. Froman.  During the December 20, 2017, hearing, defense counsel noted defendant had been evaluated by someone other than Dr. Froman, and defense counsel did not believe the evaluation comported with the statute.  Thus, defense counsel felt the question of defendant's fitness still needed to be resolved. The court appointed Dr. Froman to do a fitness evaluation and continued defendant's trial.  At the January 10, 2018, hearing, defense counsel noted defendant's fitness evaluation had taken place the day before and counsel was still in the process of reviewing the report.  Both the State and the court noted they had not seen Dr. Froman's report.  During the aforementioned pretrial

hearings, defendant often spoke during the proceedings, arguing the issues and asserting his constitutional rights.

¶ 7 On January 17, 2018, the circuit court held another pretrial hearing and noted it still had not received Dr. Froman's report and the report had not been filed in the clerk's office. Defense counsel stated he could provide the court with a copy of the report but, based on his review of the report, he was withdrawing his suggestion of unfitness. The court stated it needed to see a copy of the report. It explained defense counsel's withdrawal did not prohibit the State or the court from raising the issue. Defendant then interrupted the proceedings, stating he had rights. As the court attempted to continue the case, defendant continued to speak out. The court threatened to hold defendant in contempt if he spoke out again. Defendant talked again, and the court asked the bailiffs to take defendant into custody. After a recess, the court addressed contempt. The court explained to defendant he was being held in contempt because he continued to talk and disrupt the court proceedings. Defendant apologized and explained his financial troubles. Ultimately, the court did not find defendant in contempt, and defendant promised to do his best to stop talking when the court instructed him to be quiet.

¶ 8 Dr. Froman's report was filed on January 17, 2018, and it is part of the secured record on appeal. Thus, only Dr. Froman's "brief summary" is disclosed in our decision. Dr. Froman found, "[Defendant] is marginally, but acceptedly fit to stand trial."

¶ 9 At the January 24, 2018, pretrial hearing, the circuit court noted it had received Dr. Froman's report and asked the State if it had received the report. The prosecutor noted the State had received the report and he had reviewed it. Defense counsel again stated he was withdrawing his suggestion of unfitness. The court then addressed the date of defendant's trial, and defense counsel moved to continue it. The court continued defendant's trial.

¶ 10        On May 4, 2018, the circuit court held defendant's jury trial. The State presented the testimony of (1) Jeff Baird, a sergeant with the Quincy Police Department; (2) Robert McGee, a Quincy police officer; (3) Nick Eddy, a detective with the Quincy Police Department; (4) Jan Achelpohl, the evidence custodian for the Quincy Police Department; and (5) Julia Edwards, a drug chemist and forensic scientist with the Illinois State Police. Defendant did not present any evidence. The evidence relevant to the issues on appeal follows.

¶ 11        Sergeant Baird testified he arrived at defendant's residence with three other officers to execute arrest and search warrants. His plan was to coax defendant out of his residence and arrest him in his backyard away from the residence because it is safer for all parties to make arrests outside a "suspect's domain." Sergeant Baird, who was wearing a standard patrol uniform, approached the back door, knocked on it, identified himself through the closed door, and asked defendant to step outside of his residence to speak to the officers. Sergeant Baird heard defendant shouting from inside the residence. He first tried to coax defendant out with a ruse but that did not work. Sergeant Baird then became more direct and explained it was important for defendant to step out and speak to him. That also did not work, and Sergeant Baird told defendant they had a warrant for his arrest and defendant needed to step out of his residence. Defendant still did not comply. Sergeant Baird asked defendant if there was anything he could say or do to get defendant to exit his residence. Defendant shouted he would not comply. Sergeant Baird then breached defendant's door with a battering ram.

¶ 12        After the door to defendant's home was opened, Sergeant Baird stepped through the doorway and observed defendant standing about 10 feet in front of him. The other officers were behind Sergeant Baird. Sergeant Baird announced defendant was under arrest, and defendant stepped towards him in aggressive fashion, which Sergeant Baird explained was in a

fighting stance with his arms and face clenched. Sergeant Baird then placed defendant in a control hold to control defendant's aggressive behavior and told defendant to place his hands behind his back. Defendant did not put his hands behind his back and became more aggressive. Sergeant Baird explained defendant attempted to twist and pull and they tumbled sideways into a wall. At that point, two officers deployed their tasers to control defendant. After the second taser was deployed, Sergeant Baird felt defendant immediately comply. Sergeant Baird estimated the time between when he told defendant to put his hands behind his back and when defendant was tased was three seconds because it was enough time for (1) them to grapple, (2) defendant to twist aggressively, and (3) the two of them to tumble into the wall. Defendant was then removed from the residence so the officers could search defendant's home.

¶ 13 Sergeant Baird further testified he did not conduct the search warrant but was alerted to the contraband found. He observed the other officers collect the contraband, which was located on top of a dresser. Sergeant Baird identified State's exhibit No. 3 as a photograph of the top of the dresser. The photograph shows a yellow dish on top of the dresser.

¶ 14 Officer McGee testified he was involved in the execution of the warrants at defendant's home and believed five other officers were there as well. Sergeant Baird and defendant yelled back and forth through the closed door for about five minutes. After the battering ram was used, Sergeant Baird entered the home first, followed by Detective Eddy, and then Officer McGee. The officers were about two feet apart from each other. Upon entering, Officer McGee saw defendant standing with his "arms clenched in." Sergeant Baird had rushed toward defendant when they entered and stated defendant was under arrest. Sergeant Baird told defendant to put his hands behind his back. Defendant did not comply. According to Officer McGee, defendant kept his arms tucked into his body and tensed up to where his arms could not

- 5 -

be placed behind his back. Sergeant Baird told defendant several times to stop resisting but defendant did not comply. Detective Eddy then attempted to help Sergeant Baird place defendant's arms behind his back but was unsuccessful. At that point, Officer McGee and another officer deployed their tasers. Defendant complied and was taken outside. Officer McGee did not participate in the search warrant.

¶ 15        Detective Eddy testified he believed six or seven total officers were involved in executing the arrest and search warrants. They tried to get defendant to exit his residence but were unsuccessful. Detective Eddy was the second officer to enter the residence and at first could only see Sergeant's Baird's backside until he was able to get to Sergeant Baird's right side. Upon entry, Detective Eddy could barely walk because the officers were "stacked up on each other." Detective Eddy testified that, when he first observed defendant, he had his arms raised and was clenching and being rigid. Defendant was not following Sergeant Baird's order to put his hands behind his back so he could be placed in handcuffs. Sergeant Baird continued to tell defendant to stop resisting and put his hands behind his back. Two others deployed tasers which were not successful at first, but after a few more seconds, he and Sergeant Baird were able to get defendant to put his arms behind his back and get the handcuffs on defendant. According to Detective Eddy, it was more than a few seconds but less than a minute from the time Sergeant Baird told defendant to put his arms behind his back until the time the tasers were deployed. Defendant was removed from the house after being handcuffed.

¶ 16        Additionally, Detective Eddy testified he took part in executing the search warrant of defendant's home. He found contraband in a room he described as an "overflow room" or another bedroom. The contraband was on top of a dresser in the corner of the room. Detective Eddy observed pieces of aluminum foil, a couple of lighters, and an empty plastic pen tube, all of

- 6 -

which are used to ingest methamphetamine.  He also found a yellow dish with residue on it.  In the room, the officers also found proof of defendant's residency.  The police found no indication of any items in the house belonging to someone besides defendant.

¶ 17        Achelpohl testified regarding the chain of custody of the contraband found in defendant's residence.  Edwards testified about testing the dish for controlled substances.  She first did two color tests, which indicated the presence of methamphetamine.  Edwards then did a confirmatory test, which was gas chromatography mass spectrometry.  The test was positive for methamphetamine.

¶ 18        As previously stated, defendant did not present any evidence, and the parties rested.  The prosecutor began his closing argument as follows:

"On May 2nd, 2017, those police officers with the Quincy Police Department were just trying do their job.  They went to work and they were trying to do their job.  Their job is tough, it's not always fun, and sometimes, it can be dangerous.  But it's their job.  And they do it well.  And on May 2nd, 2017, their job was to do two things; their job was to arrest the Defendant and to search his house.  And that's what they did on May 2nd, 2017 because they just wanted to do their job.  Everything that comes after that is not anything that those officers did.  Everything that comes after that is because of what the Defendant did.  And the reason why he's sitting there right now is not because the officers were doing their job but because the Defendant is doing something wrong.  The reason why he's sitting there right now is because the Defendant chose to possess methamphetamine and because the Defendant chose to resist arrest.  And that's why he's there right now."

The prosecutor then ended his closing argument by stating the following:

"So, at the end of the trial, those officers did their job, the evidence technician, Jan Achelpohl, did her job, the chemist did her job, I did my best to do my job. Now, folks, it's time for you to do your job. Tell the Defendant that he's guilty."

¶ 19 Defense counsel then began his argument by stating the following:

"Ladies and Gentlemen, I'll start with the charge of resisting a peace officer. You heard the evidence. You heard Sergeant Baird testify that when those three officers entered the home, they were in very close proximity to each other, they were within arm's reach, three of them moving towards [defendant]. This was immediately after they had used a battering ram to knock in his door. True, that was very loud. There wasn't specific testimony about that but that would be my assumption. Sergeant Baird testified that when he first made contact or when he first observed [defendant], there was a distance of approximately 10 feet between he and [defendant]. Their purpose was to arrest [defendant]. I'm sure that they were not taking their time lollygagging. I'm sure that they were moving with a purpose towards him. Under those circumstances after having just had his door busted in, seeing three officers moving quickly towards him, my guess is that his initial reaction was something like this; having those officers in that close proximity to him, I would not be surprised if there was some sort of a defensive gesture on his part."

Defense counsel also noted, "In this case, you have not heard any evidence about any fingerprints, no evidence about [deoxyribonucleic acid (DNA)], no other evidence other than they found this plate which tested positive for methamphetamine in [defendant]'s residence, in a

- 8 -

residence that was very cluttered, by the testimony of one of the officers."

¶ 20            In his rebuttal argument, the prosecutor began by stating the following:

           "I guess I'm confused by [defense counsel]'s argument that he supposes—and first of all, let's point out that what [defense counsel] thinks is not evidence. And when [defense counsel] says, well, I think this might have happened, you really can't consider that. That's objectionable. I didn't object, but we're not allowed to do things like that. But let's say for a second that it was a reaction, a surprise reaction. Why was he surprised? The officers told him again and again and again what was going to happen. They said, if you don't open the door, we're going to break it down. Come to the door. Let us in. We're going to use a ram. You heard them testify, we gave him all kinds of opportunities not to have this happen, but then when it happened, all of a sudden he was surprised, so he clenched up, made a fist, made an aggressive face and started walking towards them? Come on. And I guess [defense counsel]'s argument is, well, he didn't resist that much. So, he's not guilty? Huh-uh. There's nothing in the case law, there's nothing in the law the judge is going to give you where you have to decide, well, he only resisted a little bit, so it's not that big of a deal. If an officer tells you to do something, you do it, and if you don't, you violated the law. It's black and white. And to suggest otherwise is just wrong."

He then ended his argument with the following:

           "You know, the Defense also said this was never tested for DNA and never tested for fingerprints, and that's absolutely true, but I have to point out that the right to test for fingerprints and the right to test for DNA does not just belong

to the People.  The Defense has that exact same right. And they never asked for it to be tested either.

What this case comes down to is that man's choices.  And he sits where he sits because he chose to violate the law, and today it's your duty, it's your responsibility, it's your job to tell him that he's guilty."

¶ 21    After deliberations, the jury found defendant guilty of both charges.  Defendant filed two posttrial motions.  The first sought a judgment notwithstanding the jury verdict and asserted the State failed to prove its case beyond a reasonable doubt.  The second requested a new trial and alleged the State in its rebuttal closing argument erroneously stated something like the following:  " 'Something the defense didn't tell you is that the defense has the right to test items also, and they didn't do that."  Defendant contended the language was inflammatory, left the jury with the impression the burden of proof rests in part with defendant, and was not based on the evidence.

¶ 22    At a joint July 20, 2018, hearing, the circuit court denied both of defendant's posttrial motions.  The court then addressed sentencing and sentenced defendant to concurrent terms of three years' imprisonment for methamphetamine possession and 180 days in the county jail for resisting a peace officer.  Defendant did not file a motion to reconsider his sentence.

¶ 23    On July 23, 2018, defendant filed a timely notice of appeal that listed only the sentencing judgment as the appealed order.  On August 3, 2018, defendant filed a timely amended notice of appeal in sufficient compliance with Illinois Supreme Court Rule 606 (eff. July 1, 2017), listing the order appealed as both defendant's conviction and sentence.  See Ill. S. Ct. Rs. 606(d), 303(b)(5) (eff. July 1, 2017).  Accordingly, this court has jurisdiction of defendant's appeal under Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013).

¶ 24                                    II. ANALYSIS

¶ 25                                    A. Plain Error

¶ 26        Defendant recognizes he has forfeited all his arguments on appeal by failing to

properly preserve them in the circuit court.  He first asks this court to review the issues under the

plain-error doctrine (Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967)).

¶ 27        The plain-error doctrine permits a reviewing court to consider unpreserved error

under the following two scenarios:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that
>
> the error alone threatened to tip the scales of justice against the defendant,
>
> regardless of the seriousness of the error, or (2) a clear or obvious error occurred
>
> and that error is so serious that it affected the fairness of the defendant's trial and
>
> challenged the integrity of the judicial process, regardless of the closeness of the
>
> evidence." *People v. Sargent*, 239 Ill. 2d 166, 189, 940 N.E.2d 1045, 1058
>
> (2010).

¶ 28        We begin a plain-error analysis by first determining whether any error occurred at

all.  *Sargent*, 239 Ill. 2d at 189, 940 N.E.2d at 1059.  If error did occur, this court then considers

whether either of the two prongs of the plain-error doctrine has been satisfied.  *Sargent*, 239 Ill.

2d at 189-90, 940 N.E.2d at 1059.  Under both prongs, the defendant bears the burden of

persuasion.  *Sargent*, 239 Ill. 2d at 190, 940 N.E.2d at 1059.

¶ 29        In the alternative, defendant raises claims of ineffective assistance of counsel.

This court analyzes ineffective assistance of counsel claims under the standard set forth in

*Strickland v. Washington*, 466 U.S. 668 (1984).  *People v. Evans*, 186 Ill. 2d 83, 93, 708 N.E.2d

1158, 1163 (1999).  To obtain reversal under *Strickland*, a defendant must prove (1) his

counsel's performance failed to meet an objective standard of competence and (2) counsel's deficient performance resulted in prejudice to the defendant. *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163. To satisfy the deficiency prong of *Strickland*, the defendant must demonstrate counsel made errors so serious and counsel's performance was so deficient that counsel was not functioning as "counsel" guaranteed by the sixth amendment (U.S. Const., amend. VI). *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163. Further, the defendant must overcome the strong presumption the challenged action or inaction could have been the product of sound trial strategy. *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163. To satisfy the prejudice prong, the defendant must prove a reasonable probability exists that, but for counsel's unprofessional errors, the proceeding's result would have been different. *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163-64. To prevail on an ineffective assistance of counsel claim, a defendant must satisfy both the performance and the prejudice prongs of *Strickland*. *People v. Houston*, 226 Ill. 2d 135, 144-45, 874 N.E.2d 23, 30 (2007).

¶ 30                                    B. Closing Argument

¶ 31            Initially, defendant argues he is entitled to a new trial because of a series of improper remarks by the prosecutor during closing arguments. First, he claims some of the prosecutor's remarks bolstered the credibility of the State's witnesses who were police officers based on their status as police officers. Second, defendant contends statements by the prosecutor improperly aligned himself with the jury. Third, he asserts the prosecutor improperly denigrated defense counsel's theory of the case in his rebuttal closing argument. Fourth, defendant contends the prosecutor misstated the law regarding resisting a peace officer in his rebuttal closing argument. Last, defendant contends the State's rebuttal closing argument also attempted to abrogate the presumption of innocence and replace it with a defense burden to disprove the

State's case.  The State argues no prosecutorial misconduct occurred during closing arguments.

This court reviews allegations of prosecutorial misconduct under the *de novo* standard of review.

*People v. Marzonie*, 2018 IL App (4th) 160107, ¶ 50, 115 N.E.3d 270.

¶ 32           Prosecutors possess a great deal of latitude in giving a closing argument.

*Marzonie*, 2018 IL App (4th) 160107, ¶ 47.  They "may properly comment on the evidence

presented and reasonable inferences drawn from that evidence, respond to comments made by

defense counsel that invite a response, and comment on the credibility of a witness."  *Marzonie*,

2018 IL App (4th) 160107, ¶ 47.  However, prosecutors cannot personally vouch for a witness's

credibility or bolster a witness's testimony.  *Marzonie*, 2018 IL App (4th) 160107, ¶ 47.

Misstating the evidence or arguing facts not in evidence is also improper.  *Marzonie*, 2018 IL

App (4th) 160107, ¶ 47.  Additionally, courts have held prosecutors should not insinuate a

particular witness is more believable than other witnesses simply due to the witness's

occupation.  *People v. Jordan*, 205 Ill. App. 3d 116, 122, 562 N.E.2d 1218, 1222 (1990) (citing

*People v. Rogers*, 172 Ill. App. 3d 471, 476-77, 526 N.E.2d 655, 660 (1988) (police officers);

*People v. Ford*, 113 Ill. App. 3d 659, 662, 447 N.E.2d 564, 567 (1983) (same)); see also *People

v. Adams*, 2012 IL 111168, ¶ 20, 962 N.E.2d 410 (police officers).  Moreover, prosecutors

cannot use closing argument simply to " 'inflame the passions or develop the prejudices of the

jury without throwing any light upon the issues.' "  *People v. Wheeler*, 226 Ill. 2d 92, 128-29,

871 N.E.2d 728, 748 (2007) (quoting *People v. Halteman*, 10 Ill. 2d 74, 84, 139 N.E.2d 286, 293

(1956)).  Prosecutors are also prohibited from utilizing closing argument to forge an

"us-versus-them" mentality because it is inconsistent with the criminal trial principle a jury

fulfills a nonpartisan role under the presumption the defendant is innocent until proven guilty.

*Wheeler*, 226 Ill. 2d at 129, 871 N.E.2d at 748.  Further, it is also improper for prosecutors to

suggest the State has no burden of proof or attempt to shift the burden of proof to the defendant. *People v. Robinson*, 391 Ill. App. 3d 822, 841, 909 N.E.2d 232, 251 (2009). In determining whether a prosecutor's comment in closing argument was improper, a reviewing court must view such comment in its proper context. *Marzonie*, 2018 IL App (4th) 160107, ¶ 47.

¶ 33                                1. Bolstering of Credibility

¶ 34            In support of his argument the prosecutor improperly bolstered the credibility of the witnesses who were police officers, defendant cites the *Ford* decision, where the reviewing court found the prosecutor's repeated references to a State's witness's status as a police officer and a sworn deputy was an improper attempt to enhance the witness's credibility. *Ford*, 113 Ill. App. 3d at 662, 447 N.E.2d at 567. There, the defendant was charged with the offense of unlawful delivery of cannabis, the police officer was the State's sole occurrence witness, the defendant testified, and the defendant's account of the incident varied from the police officer's account. *Ford*, 113 Ill. App. 3d at 660, 447 N.E.2d at 565. At one point during closing argument, the prosecutor stated the following: " 'On the one hand you have got Donna Kurlinkus who, in addition to being a Warren County Deputy, is a person of impecable (sic) credentials versus an individual, [the defendant], who by her own testimony to you people in her own community didn't trust.' " *Ford*, 113 Ill. App. 3d at 661, 447 N.E.2d at 566.

¶ 35            Here, defendant contends the prosecutor erred by stating several times in his closing argument the police officers were just doing their jobs, once stated the police officers did their jobs well, and once stated defendant was doing something wrong. He claims the prosecutor explicitly linked the officers to the law enforcement profession and emphasized their status as police officers to bolster their credibility. We disagree.

¶ 36            In this case, the only occurrence witnesses were police officers, and one of the

charges the State had to prove was defendant resisted a peace officer. Thus, the officers' status as police officers was at issue in this case. See *People v. Wrencher*, 2015 IL App (4th) 130522, ¶ 27, 31 N.E.3d 815 (noting the two elements of resisting a peace officer are (1) the defendant knowingly resisted or obstructed the peace officer's performance of any authorized act within his or her official capacity and (2) the defendant knew the peace officer was a peace officer). Moreover, the prosecutor made the statements in the opening section of his closing argument and not when he was discussing the specific evidence presented. Unlike in *Ford*, the prosecutor did not emphasize the officers were "sworn" officers or state their credentials were impeccable. Accordingly, we find the prosecutor's remarks were not an improper bolstering of the police officers' credibility based on their status as police officers.

¶ 37                                    2. Aligning with the Jury

¶ 38            Defendant next contends the prosecutor improperly aligned himself with the jury. Specifically, defendant notes the prosecutor ended his closing argument by stating the police, the evidence technician, and the drug chemists had all done their jobs; the prosecutor did his best to do his job; and now it was time for the jury to do its job. At the end of the prosecutor's rebuttal argument, he again ended by asking the jury to do its job. In support of his argument the aforementioned remarks were improper, defendant cites the case of *People v. Flax*, 255 Ill. App. 3d 103, 627 N.E.2d 359 (1993). The State contends the *Flax* decision supports its position and the prosecutor was simply weaving a theme through his closing argument.

¶ 39            In *Flax*, 255 Ill. App. 3d at 110, 627 N.E.2d at 365, the defendant argued the prosecutor's rebuttal remarks were improper because the prosecutor sought to align himself with the jurors in the same "association." The reviewing court first found the defendant had forfeited the issue by not raising it in the circuit court. *Flax*, 255 Ill. App. 3d at 110, 627 N.E.2d at 365. It

then stated, "even assuming that the error had not been waived, and assuming that defendant's characterization of the State's Attorney's remarks is correct, such error is harmless because, when considered in light of the overwhelming evidence of defendant's guilt, the remark did not result in substantial prejudice to defendant." *Flax*, 255 Ill. App. 3d at 110, 627 N.E.2d at 365.

¶ 40    Defendant contends "*Flax* is submitted to show that, given the right evidentiary circumstances, subtle steps taken by the prosecution to align itself with the jury are erroneous and warrant careful scrutiny to guard against their prejudicial effect." However, the *Flax* court never addressed the actual merits of defendant's argument the remarks were improper. It assumed error for the sake of resolving the issue and found the assumed error would be harmless. *Flax*, 255 Ill. App. 3d at 110, 627 N.E.2d at 365. Thus, the *Flax* decision does not support defendant's argument.

¶ 41    We agree with the State's assertion the prosecutor's job/duty remarks were weaving a theme through his closing arguments. The prosecutor also used a similar remark in his opening statement. It is obvious everyone noted by the prosecutor has a job to do in the prosecution of a criminal. Moreover, a prosecutor may urge the jury to do its sworn duty in closing arguments. *People v. Wilson*, 257 Ill. App. 3d 670, 685, 628 N.E.2d 472, 485 (1993). We do not find the prosecutor was trying to align itself with the jury with his job references.

¶ 42    3. Improper Characterization of Defense Counsel's Argument

¶ 43    Defendant next challenges the prosecutor's opening remarks in his rebuttal argument, in which the prosecutor stated defense counsel's thoughts were not evidence and he could have objected to defense counsel's contention. Defendant contends the prosecutor's remarks were referring to defense counsel's comments in his argument about the loudness of the police officers' entry and/or the speed at which the police officers approached defendant. In

turn, the State argues the issue based on defendant's assertion the remarks referred to loudness and speed. However, the record does not support defendant's contention the prosecutor's rebuttal remarks were referring to defense counsel's arguments about loudness and speed.

¶ 44         A full reading of both defense counsel's and the prosecutor's rebuttal arguments indicates the prosecutor was responding to defense counsel's suggestion defendant was surprised when the officers breached his door and came towards him. Defendant did not testify at all, and the officers did not testify defendant appeared surprised when they entered. Moreover, the trial evidence showed the police had been talking awhile with defendant before their entry into defendant's home. Thus, defendant's surprised reaction is not a reasonable inference from the evidence presented at trial. Accordingly, we do not find the prosecutor's remarks were an improper characterization of defense counsel's closing argument.

¶ 45                                  4. Misstatement of Law

¶ 46         Defendant further argues the prosecutor erred by misstating the law concerning resisting a peace officer. The State disagrees.

¶ 47         Defendant contends the prosecutor's remark indicating not following a police directive is a violation of law was a misstatement of law because the State must prove a physical act of resistance to prove the offense. In support of his argument, defendant cites *People v. Flannigan*, 131 Ill. App. 2d 1059, 1063, 267 N.E.2d 739, 742 (1971), where the reviewing court reversed the defendant's conviction for resisting a police officer due to the lack of a physical act of resistance. The State cites several cases suggesting *Flannigan* is no longer good law. However, our supreme court has more recently stated " 'resist' implies some type of physical exertion in relation to the officer's actions." *People v. Baskerville*, 2012 IL 111056, ¶ 25, 963 N.E.2d 898. Thus, we agree with defendant the prosecutor's statement in closing argument was

a misstatement of law since it did not convey a physical act of resistance was necessary to violate the statutory provision.

¶ 48        As to plain error, defendant raises a first prong plain-error argument and contends the evidence was closely balanced regarding the offense of resisting a peace officer. Specifically, he contends the State presented inconsistent testimony as to whether defendant actually did or even had sufficient time to engage in a physical act of resistance. The State contends its evidence was overwhelming.

¶ 49        After the police entered defendant's residence, Sergeant Baird testified he told defendant he was under arrest and defendant stepped towards him in an aggressive fashion. Sergeant Baird explained defendant took a fighting stance with arms and "face clenched." Sergeant Baird engaged him in a control hold and instructed him to place his hands behind his back. Defendant did not comply and became more aggressive by attempting to twist and pull. Defendant and Sergeant Baird tumbled into the wall. After the other officers deployed their tasers, defendant immediately complied. Sergeant Baird estimated the time between when he told defendant to put his hands behind his back and when defendant was tased was three seconds. Officer McGee testified that, when Sergeant Baird entered, defendant "stood with his arms clenched in." Sergeant Baird told defendant he was under arrest and directed defendant to put his hands behind his back. Defendant did not comply, kept his arms tucked into his body, and tensed up to the point where his arms could not be placed behind his back. Sergeant Baird told defendant to stop resisting several times, and then Officer Eddy attempted to place defendant's arms behind his back and was also unsuccessful in doing so. At that point, the other officers tased defendant, and defendant complied. Detective Eddy testified that, when he first observed defendant, he had his arms raised and was clenching and being rigid. Defendant was not

following Sergeant Baird's order to put his hands behind his back so he could be placed in handcuffs. Two others deployed tasers which were not successful at first, but after a few more seconds, he and Sergeant Baird were able to get defendant to put his arms behind his back and get the handcuffs on defendant. According to Detective Eddy, it was more than a few seconds but less than a minute from the time Sergeant Baird told defendant to put his arms behind his back until the time the tasers were deployed.

¶ 50        While the police officers' estimates varied as to the time lapse between when Sergeant Baird ordered defendant to put his arms behind his back and when the tasers were deployed, all three officers testified defendant tensed/clenched his arms in a manner that prevented Sergeant Baird from placing handcuffs on defendant. Thus, in this case, the evidence of defendant engaging in a physical act of resistance was overwhelming. Accordingly, defendant has failed to prove first-prong plain error.

¶ 51                              5. Shifting the Burden of Proof

¶ 52        Defendant last claims the prosecutor improperly shifted the burden of proof by noting in his rebuttal argument defendant had likewise not presented fingerprint or DNA evidence from the yellow dish. The State disagrees that remark was improper.

¶ 53        In support of his argument, defendant cites this court's decision in *People v. Beasley*, 384 Ill. App. 3d 1039, 893 N.E.2d 1032 (2008). There, the prosecutor responded to an argument by defense counsel concerning the State's failure to submit certain evidence for fingerprint testing by saying: "If it's unconscionable on the part of the State not to test certain items for fingerprints, it's just as unconscionable on the part of the defense. So, if you want something tested, you get it tested. You can't sit back and say, Well, nobody tested it; therefore, the evidence fails." (Internal quotation marks and alterations omitted.) *Beasley*, 384 Ill. App. 3d

- 19 -

at 1048, 893 N.E.2d at 1040.  In holding the aforementioned remark improperly shifted the burden of proof to the defendant, we explained that, while a defendant is able to submit evidence for analysis, the defendant has no burden to do so and, as such, "[a] defendant's failure to submit evidence for analysis cannot be considered 'unconscionable.' " *Beasley*, 384 Ill. App. 3d at 1048, 893 N.E.2d at 1040.

¶ 54        A later case distinguished the *Bealsey* decision.  In *People v. Kelley*, 2015 IL App (1st) 132782, ¶ 66, 41 N.E.3d 939, the reviewing court explained the *Beasley* decision's holding as follows:  "[b]y describing the defendant's failure to submit evidence as 'unconscionable,' the State implied that the defendant had a burden of proof."  Under the facts before it, the *Kelley* court found the State did not improperly shift the burden of proof by eliciting testimony from its expert witnesses indicating the defendant could have requested forensic tests on untested crime scene evidence.  *Kelley*, 2015 IL App (1st) 132782, ¶¶ 60, 70.  In reaching that decision, the reviewing court noted the State did not describe the defendant's omission as unconscionable. *Kelley*, 2015 IL App (1st) 132782, ¶ 67.  Additionally, it noted the apparent purpose for the testimony was to address evidentiary concerns raised during the defendant's cross-examination. *Kelley*, 2015 IL App (1st) 132782, ¶ 67.

¶ 55        Moreover, in *People v. Legore*, 2013 IL App (2d) 111038, ¶ 57, 996 N.E.2d 148, the reviewing court found the prosecutor did not err in closing arguments by stating the defendant did not produce a witness's timecard.  The court explained as follows:

> "Additionally, while the prosecution is generally not allowed to comment
> on a defendant's failure to produce evidence, such comments are acceptable if a
> defendant with equal access to that evidence assails the prosecution's failure to
> produce it. *People v. Jackson*, 399 Ill. App. 3d 314, 319[, 926 N.E.2d 786, 791]

(2010). Thus, as the defense argued that the State could have introduced [a witness]'s time card into evidence, it was not error for the State to argue that defendant also did not introduce the time card. *Cf. People v. Nowicki*, 385 Ill. App. 3d 53, 91[, 894 N.E.2d 896, 931] (2008) (it was proper for prosecutor to point out that the defendant could have subpoenaed police officers, in response to the defense's highlighting that the State had not called officers as witnesses); *People v. Baugh*, 358 Ill. App. 3d 718, 741-42[, 832 N.E.2d 903, 923] (2005) (prosecutor's argument that the defendant could have produced telephone records was not improper where defense counsel had argued that the State could have produced such records but had chosen not to)." *Legore*, 2013 IL App (2d) 111038, ¶ 57.

¶ 56        Here, in his closing argument, defense counsel pointed out no fingerprint, DNA, or other type of evidence found on the dish containing residue which tested positive for methamphetamine was presented. In his rebuttal argument, the prosecutor noted the defendant also had the right to test for DNA and fingerprints and defendant also did not ask for such testing. We find the prosecutor's remark was in response to defendant's comment highlighting the State's lack of such evidence. Moreover, unlike in *Beasley*, the prosecutor did not use the term "unconscionable" or in any way suggest defendant's failure to produce such evidence was unreasonable. Accordingly, we find the prosecutor's remarks did not improperly shift the burden of proof to defendant.

¶ 57                            C. Circuit Court's Directive to the Jury

¶ 58        Defendant next contends the circuit court denied defendant a fair trial when it directed the juror not to ask any questions during deliberations. The State disagrees.

¶ 59 Generally, a circuit court has a duty to provide instruction to the jury when the jury has posed an explicit question or requested clarification on a point of law arising from facts about which doubt or confusion exists. *People v. Childs*, 159 Ill. 2d 217, 228-29, 636 N.E.2d 534, 539 (1994). The duty remains even when the jury was properly instructed originally. *Childs*, 159 Ill. 2d at 229, 636 N.E.2d at 539. When a jury expresses difficulties, the circuit court should resolve them with specificity and accuracy. *Childs*, 159 Ill. 2d at 229, 636 N.E.2d at 539. A circuit court's failure to answer or to give a response which provides no answer to the particular question of law posed by a jury has been found to be prejudicial error. *Childs*, 159 Ill. 2d at 229, 636 N.E.2d at 539.

¶ 60 Here, in instructing the jury about deliberations, the circuit court stated the following:

> "Okay. Members of the jury, you are shortly going to be in the care of the two bailiffs who have been attending the trial. They have been instructed by this court not to permit any person to speak to you or otherwise communicate with you on the subject connected with the trial except with the permission of the Court. I am directing those bailiffs not to communicate with you on any subject connected with the trial and I direct you not to ask the bailiffs any question pertaining thereto."

Defendant claims the last sentence informed the jurors they were not allowed to ask questions under any circumstances, which constitutes prejudicial error since jurors are entitled to have their questions addressed by the court. We disagree. The language of the last sentence only forbids the jury from asking the bailiffs questions about the case. The preceding sentence indicates a person could speak to the jurors about the trial with the permission of the circuit court. Thus, the

- 22 -

jurors were aware the court could allow a discussion with them. Accordingly, we find the circuit court did not forbid the jurors from asking any questions about the trial if they had a question.

¶ 61        Since we have found only one error and determined it was not plain error, we need not address defendant's cumulative error and ineffective assistance of counsel arguments.

¶ 62                                   D. Fitness Hearing

¶ 63        Defendant last contends the circuit court erred by failing to *sua sponte* order a fitness hearing. The State contends defendant cannot raise this issue based on the doctrine of invited error because defense counsel withdrew his suggestion of unfitness when a report concluded defendant was fit. Defendant asserts this court should address the issue because the doctrine of invited error does not apply and he raised a claim of ineffective assistance of counsel. Regardless, we find no error.

¶ 64        Section 104-10 of the Code of Criminal Procedure of 1963 provides a presumption a defendant is fit to stand trial or plead and be sentenced and states a defendant is only unfit "if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (West 2016). The defense, the State, or the court may raise the issue of the defendant's fitness at any appropriate time before a plea is entered or before, during, or after trial. 725 ILCS 5/104-11(a) (West 2016). A fitness hearing is required only upon a *bona fide* doubt of a defendant's fitness. 725 ILCS 5/104-11(a) (West 2016). "A number of factors may be considered in assessing whether a *bona fide* doubt of fitness is raised, including a defendant's irrational behavior, demeanor at trial, any prior medical opinion on the defendant's competence, and any representations by defense counsel on the defendant's competence \*\*\*." *People v. Brown*, 236 Ill. 2d 175, 186-87, 923 N.E.2d 748, 755 (2010). However, no fixed or immutable

sign "invariably indicates the need for further inquiry on a defendant's fitness." *Brown*, 236 Ill. 2d at 187, 923 N.E.2d at 755. "[T]he question is often a difficult one implicating a wide range of manifestations and subtle nuances." *Brown*, 236 Ill. 2d at 187, 923 N.E.2d at 755. The determination of whether a *bona fide* doubt of the defendant's fitness exists rests within the discretion of the circuit court, which is in the best position to observe the defendant and evaluate his or her conduct. *People v. Washington*, 2016 IL App (1st) 131198, ¶ 72, 64 N.E.3d 28. A circuit court abuses its discretion only if no reasonable person would take the circuit court's view or if its ruling is arbitrary, fanciful, or unreasonable. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 53, 960 N.E.2d 27.

¶ 65       Here, defense counsel made a suggestion of unfitness in this case. Defendant was disruptive in the courtroom by talking frequently. However, defendant himself insisted he was fit to stand trial and provided defense counsel with documentation of his fitness. Defense counsel still desired a fitness evaluation by a court-appointed evaluator. The court appointed Dr. Froman to evaluate defendant's fitness. Dr. Froman evaluated defendant and concluded defendant was "marginally, but acceptedly fit to stand trial." At a January 17, 2018, status hearing, defense counsel noted he had reviewed the report and wanted to withdraw his suggestion of unfitness. The circuit court wanted the report filed with the court because defense counsel's withdrawal of his suggestion of unfitness did not prevent the State or the court from raising the issue. The report was filed with the circuit court on January 17, 2018. At a January 24, 2018, status hearing, the court confirmed it had received the report and asked the State to confirm its receipt. The State did so and noted it had reviewed the report. Neither the State nor the court raised an issue as to defendant's fitness, and defendant's case was set for trial.

¶ 66       Defendant contends the circuit court did not review Dr. Froman's report and

instead deferred to defense counsel's position on the matter. While the court did not explicitly state on the record it had reviewed the report, the court had several days to review the report before the January 24, 2018, hearing. Moreover, the court's insistence the report be filed with the court even though defense counsel was no longer raising an issue as to defendant's fitness suggests the court did review the report when it was filed. We disagree with defendant the record shows the circuit court deferred to defense counsel on the matter of fitness.

¶ 67 Further, given the circuit court's observation of defendant at the pretrial hearings and the report's finding defendant was fit to stand trial, we find the circuit court did not abuse its discretion by failing to hold a fitness hearing. While defendant frequently interrupted the pretrial proceedings and talked a great deal during those proceedings, defendant appeared to understand the legal proceedings. Additionally, we note the State also did not request a fitness hearing after reviewing the report by Dr. Froman.

¶ 68 III. CONCLUSION

¶ 69 For the reasons stated, we affirm the Adams County circuit court's judgment.

¶ 70 Affirmed.